UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**ANGEL PANTOJA,**

**Plaintiff,**

**v.**

**ALICE ARSENAULT, individually and as an employee of the Department of Children and Families, JANE and JOHN DOES, individually and as employees of the Department of Children and Families, and JANE and JOHN DOES, individually and as employees of the Fall River Police Department,**

**Defendants.**

**Case No. 25-cv-10289-DJC**

# MEMORANDUM AND ORDER

**CASPER, C.J.** **August 26, 2026**

## I. Introduction

Plaintiff Angel Pantoja ("Pantoja") has filed this lawsuit against Defendants Alice Arsenault ("Arsenault"), individually and as an employee of the Department of Children and Families ("DCF"), Jane and John Does, individually and as employees of DCF, and Jane and John Does, individually and as employees of the Fall River Police Department (the "FRPD"), asserting claims for denial of his rights to due process (Count I) and equal protection (Count II) under both the U.S. Constitution and the Commonwealth's Declaration of Rights, as well as for intentional misrepresentation or deceit (Count III), intentional infliction of emotional distress (Count IV) and

harassment (Count V). D. 20 (amended complaint). FRPD has moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(1), D. 15,[1] and Arsenault has moved to dismiss same pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P 12(b)(6). D. 27. For the reasons stated below, the Court ALLOWS both motions. D. 15; D. 27.

## II. Standard of Review

For a Rule 12(b)(1) motion, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." Aversa v. United States, 99 F.3d 1200, 1209-10 (1st Cir. 1996) (citing Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy, 45 F.3d at 522 (quoting Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)). Standing is a jurisdictional issue, see P.R. Tel. Co. v. T-Mobile P.R. LLC, 678 F.3d 49, 57 (1st Cir. 2012), and, accordingly, challenges to standing are considered under Rule 12(b)(1). See Kolancian v. Snowden, 532 F. Supp. 2d 260, 261 (D. Mass. 2008).

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. Id. Second, the

[1] FRPD moved to dismiss the amended complaint, D. 15, after Pantoja filed his motion for leave to file same (which attached the proposed amended complaint), D. 11, which the Court subsequently allowed Pantoja leave to file. D. 18, 20.

Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted).

## III. Factual Background

The Court draws the following facts from the amended complaint, D. 20, and it accepts the well-pleaded factual allegations as true for purposes of resolving the motions to dismiss.

Pantoja had a romantic relationship with Shianna Kelly ("Kelly") prior to 2015. D. 20 ¶ 8. As alleged, after their relationship ended and unbeknownst to Pantoja, Kelly gave birth to their child. Id. Later, when DCF became involved with the child, Kelly informed DCF that Pantoja was the father. Id. A paternity action ensued. Id. In the interim, Kelly's parents gained temporary custody of the child from approximately 2015 until 2020. Id. ¶ 9.

During this time, Pantoja was granted visitation with the child. Id. ¶ 11. Pantoja alleges that he was treated with "hostility and contempt" by Kelly's parents during these visits, and that Kelly's parents began making false claims to DCF, including through anonymous phone calls, that Pantoja was abusing and neglecting the child during his visits. Id. ¶¶ 11-12. As alleged, these accusations led to Pantoja being arrested and jailed, with charges eventually dismissed for lack of evidence. Id. ¶ 13. DCF also conducted "several 51A abuse investigations" of Pantoja stemming from the anonymous phone calls. Id. ¶ 14. As Pantoja alleges, these investigations were ultimately found to be without basis. Id.

Specifically, Pantoja alleges that DCF employees "began harassing and intimidating him" in 2016, and that DCF employees continued to do so for approximately five years. Id. ¶¶ 16-19. This treatment began with one DCF employee making "condescending and/or disparaging

remarks" to Pantoja during a supervised visit with the child, resulting in Pantoja asking the employee to leave his house. Id. ¶ 17. During a different supervised visit, Pantoja alleges that Arsenault, a DCF employee and Kelly's case worker, stated that she was "going to harass him until he lost custody of his son." Id. ¶ 18.

The paternity action ultimately confirmed that Pantoja was the father of the child. Id. ¶ 8. He filed an action seeking sole custody, which was granted in 2020 by a state family court. Id. ¶¶ 10, 15. In 2021, Pantoja alleges that members of FRPD falsely charged him with hitting the child with a belt, and that such charges were later dismissed. Id. ¶ 19. That same year, DCF "conducted multiple 51A investigations" into Pantoja "solely based on the Grandparents' false accusations" of child abuse. Id. ¶ 20.

In 2023, FRPD again charged Pantoja with hitting the child with a belt. Id. ¶ 21. Pantoja denies this claim and alleges that the child sustained a small cut while visiting Kelly's parents, who then "coached" the child to tell school officials that Pantoja harmed him. Id. Pantoja contends that the child "recanted to him the next morning," and that school officials would not speak with him and instead reported the incident to "other officials." Id. DCF allegedly refused Pantoja's right to appeal this most recent accusation. Id. ¶ 20. As a result of this incident, Kelly's parents gained temporary custody of the child. Id. ¶ 22. Pantoja was denied visitation and has not seen the child since this time. Id.

Pantoja has since departed Massachusetts. Id. ¶ 23. In the process, he sold his residence, losing two rental incomes, along with personal possessions he could not afford to move. Id. ¶¶ 24-25. He alleges that he has been "blacklisted, rejected, and continues to have difficulty obtaining

employment" because of these accusations, and that he now suffers from "great emotional distress, [and] anxiety." Id. ¶¶ 27-28, 29.[2]

## IV. Procedural History

Pantoja initiated this case on February 5, 2025, D. 1, and filed the operative amended complaint thereafter. D. 20. Both FRPD, D. 15, and Arsenault, D. 27, have moved to dismiss the amended complaint.

## V. Discussion

Pantoja asserts five claims against Defendants: denial of his right to due process (Count I), D. 20 ¶¶ 31-35;[3] denial of his right to equal protection (Count II), id. ¶¶ 37-41; intentional misrepresentation or deceit (Count III), id. ¶¶ 42-45; intentional infliction of emotional distress (Count IV), id. ¶¶ 46-50; and harassment (Count V), id. ¶¶ 51-52.

### A. Claims Against Arsenault in His Official Capacity

Since Arsenault contends that certain claims should be dismissed as asserted against her both in her official capacity and individual capacity, D. 27 at 1-2, the Court assesses each of these arguments in turn.

#### 1. *Arsenault Has Eleventh Amendment Sovereign Immunity (Counts I-II)*

As an initial matter, Arsenault argues that Pantoja's constitutional claims (Counts I-II) against her in her official capacity seeking damages must be dismissed as barred by the Eleventh Amendment. D. 28 at 4-8.

---

[2] The amended complaint, D. 20, includes two paragraphs labeled "29," so the Court is referring here to the second of these paragraphs.

[3] The amended complaint, D. 20, includes two paragraphs labeled "35," so the Court is referring here to both of them.

"It is well established that any federal court lawsuit 'in which the State or one of its agencies or departments is named as the plaintiff is proscribed by the Eleventh Amendment.'" Hanna v. Dep't of Child. & Fams., No. 23-cv-12340-ADB, 2024 WL 4827832, at *7 (D. Mass. Nov. 19, 2024) (quoting Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)). Sovereign immunity extends to "shield[] state officials from being sued for damages in their official capacities" with two exceptions: (1) if Congress expressly authorizes such a suit or (2) if a state waives its sovereign immunity and consents to be sued in federal court. Id.

"DCF is an agency of the Commonwealth of Massachusetts and thus is entitled to sovereign immunity from suit in this court." Id. (internal quotation marks omitted) (quoting Pineda v. Dep't of Child. & Fams., No. 16-cv-12229-WGY, 2016 WL 6661143, at *3 (D. Mass. Nov. 9, 2016)). "[B]ecause 'neither a state agency nor a state official acting in [her] official capacity may be sued for damages in a [§ ]1983 action,'" McNulty v. Massachusetts Dep't of Child. & Fams., No. 11-cv-11569-GAO, 2014 WL 4965403, at *2 (D. Mass. Sept. 30, 2014) (quoting Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir. 1991)), and because Arsenault is a DCF employee, D. 28 at 1, she is entitled to sovereign immunity. See id. at *2, 6 (dismissing § 1983 claim "against DCF and its employees in their official capacities").

Neither of the two exceptions to sovereign immunity, Hanna, 2024 WL 4827832, at *7, apply to Pantoja's due process (Count I) and equal protection (Count II) claims. D. 20 ¶¶ 31-41. As to the first exception for Congressional abrogation of a state's immunity, Pantoja's constitutional claims (Counts I-II), even to the extent they are brought under § 1983, "do[] not abrogate state immunity by expressly authorizing a suit in federal court." Hanna, 2024 WL 4827832, at *7. As to the second exception, the Commonwealth has not consented to suit. Id.; see Tierney v. Town of Framingham, 292 F. Supp. 3d 534, 542 (D. Mass. 2018) (dismissing § 1983

claims against state officials, including DCF social workers, where "plaintiffs have not even attempted to show that sovereign immunity has been waived"). "Accordingly, the § 1983 claim[] against [Arsenault in her official capacity] [is] barred by the Eleventh Amendment." Hanna, 2024 WL 4827832, at *7.

In opposition to this basis for dismissal, Pantoja does not claim either of the two exceptions to sovereign immunity discussed above apply here. Instead, he cites Nasir v. Town of Foxborough, No. 19-cv-11196-DJC, 2020 WL 1027780, at *9 (D. Mass. Mar. 3, 2020) (dismissing state law tort claims against Defendants applying common law immunity), D. 31 at 5, which dealt with Massachusetts common law immunity, rather than the sovereign immunity claimed by Arsenault. D. 28 at 4-8 (raising "sovereign immunity" in support of Arsenault's motion to dismiss); see Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 146 (1st Cir. 2016) (providing that common law immunity stems from "Massachusetts common law").

Given the above analysis, sovereign immunity shields Arsenault from liability for damages in her official capacity under Counts I and II.

*2. Arsenault Is Not a Person Under § 1983 (Counts I-II)*

Counts I and II also fail against Arsenault in her official capacity because she is not considered a "person" under 42 U.S.C. § 1983. "There is no right of action under § 1983 against . . . state officials sued in their official capacities, because such [officials] are not considered 'persons' subject to suit under the statute." Segrain v. Duffy, 118 F.4th 45, 72 n.16 (1st Cir. 2024) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)). Further, a litigant complaining of a constitutional violation "must utilize 42 U.S.C. § 1983" and cannot sue directly under the Constitution. McCann v. City of Lawrence, 659 F. Supp. 2d 243, 247 (D. Mass. 2009) (internal quotation marks omitted) (quoting Wilson v. Moreau, 440 F. Supp. 2d 81, 92

(D.R.I. 2006)). Because a state agency, such as DCF, and its employees, such as Arsenault, are not "persons" under § 1983, Segrain, 118 F.4th at 72 n.16, Counts I and II against Arsenault, insofar as they are brought under § 1983, and insofar as they are brought against Arsenault in her official capacity, fail.

*3. Arsenault Is Immune Under the Massachusetts Tort Claims Act (the "MTCA") §10(c) (Counts III-IV)*

Arsenault is also immune in her official capacity from liability for Counts III-IV stemming from Pantoja's tort claims under § 10(c) of the MTCA. D. 20 ¶¶ 42-50. "Although [the MTCA] abrogates the doctrine of sovereign immunity for certain tort claims, it does so 'only to the extent provided in the statute.'" Hanna, 2024 WL 4827832, at *7 (quoting Titus v. Town of Nantucket, 840 F. Supp. 2d 404, 411 (D. Mass. 2011)). The MTCA specifically provides that liability "shall not apply to . . . any claim arising out of an intentional tort, including . . . intentional mental distress . . . misrepresentation, [or] deceit." Mass. Gen. L. c. 258, § 10(c). As Count III alleges intentional misrepresentation or deceit, D. 20 ¶¶ 42-45, and Count IV alleges intentional infliction of emotional distress, id. ¶¶ 46-50, neither Count falls within the ambit of the MTCA, Mass. Gen. L. c., § 10(c), and, therefore, neither can be brought against Arsenault in her official capacity. Hanna, 2024 WL 4827832, at *7 (providing that "the Commonwealth may . . . assert sovereign immunity as a defense to claims brought in federal court").

For all of these reasons, the Court dismisses Counts I-IV against Arsenault in her official capacity.

### B. Claims Against Arsenault in His Individual Capacity

#### 1. *Pantoja's Constitutional Claims Against Arsenault Are Barred by Qualified Immunity (Counts I-II)*

As to Counts I and II, the constitutional claims, Arsenault is entitled to qualified immunity. D. 28 at 10-13. "When government officials are sued in their individual capacities for money damages, the doctrine of qualified immunity shields them from pecuniary liability unless their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lawless v. Town of Freetown, 63 F.4th 61, 67 (1st Cir. 2023) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Determination of whether qualified immunity bars a claim requires a particularized analysis. Sabey v. Butterfield, 720 F. Supp. 3d 82, 92 (D. Mass. 2024) (internal quotation marks omitted) (quoting Hatch v. Dep't for Child., 274 F.3d 12, 20 (1st Cir. 2001)). First, the Court must consider "'whether the plaintiff has alleged the violation of a constitutional right.'" Id. (quoting Hatch, 274 F.3d at 20). If so, the Court then considers "'whether the contours of the right were sufficiently established at the time of the alleged violation.'" Id. (quoting Hatch, 274 F.3d at 20). This latter determination requires establishing whether the contours of the right were sufficiently clear such that an "objectively reasonable official would have believed that the action taken or omitted violated the right at issue." Id. "In conducting this analysis, '[c]ourts have discretion to decide whether, on the facts of a particular case, it is worthwhile to address first whether the facts alleged make out a violation of a constitutional right.'" Hootstein v. Collins, 928 F. Supp. 2d 326, 337 (D. Mass. 2013) (alteration in original) (quoting Maldonado v. Fontanes, 568 F.3d 263, 270 (1st Cir. 2009)).

Pantoja's alleged factual basis for both constitutional claims (Counts I-II) is Arsenault's 2016 comment to him, made during a supervised visitation with the child, that she was "going to harass him until he lost custody of his son." D. 20 ¶ 18; see id. ¶¶ 33, 40. Pantoja appears to

invoke Pantoja's constitutional right to family integrity. D. 31 at 3-4 (alleging that "his minor [child] was separated from him"). While "[t]he Supreme Court has recognized a constitutional right to familial integrity . . . that right is neither 'absolute [n]or unqualified;'" rather, it is balanced against the government's interest in child welfare. Doe Next Friend of A v. Spears, 630 F. Supp. 3d 290, 296 (D. Mass. 2022) (alteration in original) (quoting Frazier v. Bailey, 957 F.2d 920, 929 (1st Cir. 1992)). "This Court must, therefore, look to the specific allegations against [Arsenault] in light of the rest of the facts, and the rest of the implicated interests, set out in the amended complaint." Id.

Drawing all reasonable inferences in favor of Pantoja, Arsenault's comment could evince an intent on her part to remove the child from Pantoja's custody. This lone comment, however, "fail[s] to clear the first prong of the qualified immunity analysis because [Pantoja does] not set forth sufficient facts" to allege a constitutional violation. Hootstein, 928 F. Supp. 2d at 338; see Shalders v. Dep't of Child. & Fams., No. 22-cv-12231-NMG, 2024 WL 6048237, at *3, *8 (D. Mass. Aug. 2, 2024) (determining that "DCF defendants are entitled to qualified immunity" where plaintiffs alleged that they, among other actions, "harass[ed plaintiff] about her need to comply with the DCF action plan") (internal quotation marks omitted), report and recommendation adopted, No. 22-cv-12231-NMG, 2024 WL 4190082 (D. Mass. Sept. 12, 2024). Pantoja does not allege that this comment delayed or prevented him gaining custody of his son; indeed, even as alleged, Arsenault made this comment back in 2016, D. 20 ¶ 18, and he later gained custody of the child in 2020, id. ¶ 15. Because Arsenault's "alleged conduct did not violate any clearly established constitutional right[,] . . . she is entitled to qualified immunity." Doe Next Friend of A, 630 F. Supp. 3d at 297.

Even assuming *arguendo* that Pantoja has plausibly alleged a constitutional right, qualified immunity still applies since the contours of this "right" were not sufficiently clear, such that an objectively reasonable official would have believed that Arsenault's single comment violated that right. See Hootstein, 928 F. Supp. 2d at 338. The government has a "'compelling interest in the welfare of children,'" Wilmot v. Tracey, 938 F. Supp. 2d 116, 136 (D. Mass. 2013) (quoting Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993)), and that interest grants DCF employees, such as Arsenault, "some amount of leeway to act in the interest of what [they have] reason to believe [are] imperiled children." Doe Next Friend of A, 630 F. Supp. 3d at 297; see Wilmot, 938 F. Supp. 2d at 139 (explaining that "[t]he fact that the [DCF] investigation was not perfect does not rise to the level of a constitutional violation or prevent the DCF's employees from being granted qualified immunity"). "Under these circumstances, [Pantoja's] limited constitutional interest in familial integrity, although sincere, must be balanced against the government's interest in investigating allegations of child abuse," and, within this framework, Arsenault's alleged conduct "did not violate any clearly established constitutional right." Doe Next Friend of A, 630 F. Supp. 3d at 297.

### 2. *Pantoja Fails to Plead Plausible Claims Against Arsenault in Her Individual Capacity as to Counts III and IV*

As argued by Arsenault, D. 28 at 8-10, Pantoja has failed to state a claim under either Count III (intentional misrepresentation or deceit) or Count IV (intentional infliction of emotional distress).

As to Count III, "to establish a cause of action for fraud and deceit, a plaintiff must show 'that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [its] damage.'" Ascend Learning, LLC v. Bryan, No.

22-cv-11978-ADB, 2024 WL 3834893, at *3 (D. Mass. Aug. 14, 2024) (alteration in original) (quoting Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982)). "Rule 9(b)'s heightened pleading requirements apply" to claims of fraud, Chagnon v. Truefort, Inc., 772 F. Supp. 3d 198, 211 (D. Mass. 2025), and require Pantoja to "'specify the statements that the plaintiff contends were fraudulent, explain why they were fraudulent, and otherwise identify the who, what, where, and when of the allegedly [misleading] representation with particularity.'" Id. (quoting SRH Holdings, LLC v. Government Employees Ins. Co., No. 23-cv-10325-DJC, 2023 WL 4706176, at *7 (D. Mass. July 24, 2023)).

Pantoja's allegations in Count III are general to all Defendants. D. 20 ¶¶ 42-45 (claiming Defendants "made false representations to and about" Pantoja which were "detrimental" to him "in that he lost custody of his [child] and visitation rights," along with employment opportunities, political office, and rental income). The one comment attributed to Arsenault, id. ¶ 18, the 'who' at issue here, is not sufficient to state a cause of action under the tort of intentional misrepresentation or deceit. See Ascend Learning, LLC, 2024 WL 3834893, at *3. Even as alleged, the comment, D. 20 ¶ 18, is not claimed to be false, to have been made with knowledge of its falsity, or to have been made with the purpose of inducing Pantoja to act. See Ascend Learning, LLC, 2024 WL 3834893, at *3 (dismissing claim for intentional misrepresentation where allegations fail to "describe[] with particularity the allegedly misleading representations"); Chagnon, 772 F. Supp. 3d at 211 (explaining that intentional misrepresentation claim requires "'explain[ing] why [the statements] were fraudulent'" (quoting SRH Holdings, LLC, 2023 WL 4706176, at *7)). Further, Pantoja also does not allege how, if at all, he "relied upon" Arsenault's comment, specifically, or otherwise "acted upon" it to his damage. Ascend Learning, LLC, 2024 WL 3834893, at *3 (internal quotation marks omitted) (quoting Danca, 385 Mass. at 8); see D. 20

¶ 18. Accordingly, Pantoja's claims under Count III as to Arsenault, in her individual capacity, fails.

As to Count IV, to state a claim for intentional infliction of emotional distress, Pantoja must plausibly allege the following: "(1) that the plaintiff 'intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct[,]' (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community[,]' (3) that the defendant's actions caused the plaintiff distress, and (4) that the plaintiff's emotional distress was severe." Wilmot, 938 F. Supp. 2d at 144 (alternations in original) (quoting Howell v. Enter. Publ'g Co., LLC, 455 Mass. 641, 672 (2010)). "Courts apply a 'very high' standard to [such] claims, especially as to the nature of the conduct." Roe v. Lincoln-Sudbury Reg'l Sch. Dist., No. 18-cv-10792-FDS, 2021 WL 1132256, at *43 (D. Mass. Mar. 24, 2021) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996)). Mere insults or threats are not enough. Id.

Even assuming that Arsenault's intent was to harm, a single comment does not meet the high bar of extreme and outrageous conduct. See Silva v. Town of Uxbridge, 771 F. Supp. 3d 56, 75 (D. Mass. 2025) (explaining that "isolated remarks do not form the basis for an [intentional infliction of emotional distress] claim," even where the "single remark" is "concerning"); Polay v. McMahon, 468 Mass. 379, 387 (2014) (determining that a "single 'verbal[] attack' . . . fail[ed] to establish extreme and outrageous conduct" required for intentional infliction of emotional distress claim (alteration in original)). At least for the aforementioned reasons, Pantoja's claim for intentional infliction of emotional distress, Count IV, against Arsenault in her individual capacity fails.

### C. Claims Against FRPD

#### *1. FRPD Officers Are Entitled to Qualified Immunity (Counts I-II)*

In moving to dismiss under Fed. R. Civ. P. 12(b)(1), FRPD argues that qualified immunity bars all of Pantoja's claims, D. 15 at 1-2, depriving the Court of subject matter jurisdiction and requiring dismissal; however, FRPD only makes specific arguments about this ground as to Counts I and II, D. 16 at 6-11.

The alleged factual basis of Pantoja's claims against FRPD consists of FRPD's 2021 arrest of Pantoja for "assaulting and beating his son with a belt," D. 20 ¶ 19, and FRPD's 2023 arrest of Pantoja for same, id. ¶ 21. Pantoja alleges that FRPD failed to "fully investigate the alleged incident[s], the motives and/or mental stability of the accusers," and relied solely on "unsubstantiated evidence, without proper basis or investigation." Id. ¶¶ 35, 41.

The Court undertakes the same inquiry as it did with the same claims against Arsenault, looking to whether Pantoja has alleged a violation of any constitutional right, and if the contours of any such right were established at the time of the violation so as to be sufficiently clear to an objectively reasonable official. Sabey, 720 F. Supp. 3d at 92 (internal quotation marks omitted) (quoting Hatch, 274 F.3d at 20). As to the FRPD officers, "a police officer is entitled to qualified immunity 'so long as the presence of probable cause is at least arguable.'" Thomas v. City of Bos., No. 21-cv-10596-IT, 2022 WL 17671919, at *7 (D. Mass. Dec. 14, 2022) (quoting Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Id. (internal quotation marks omitted) (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).

To the first prong of a qualified immunity analysis, Sabey, 720 F. Supp. 3d at 92, Pantoja claims a denial of his right to due process (Count I), D. 20 ¶ 35, and his right to equal protection

(Count II), id. ¶ 41. Taken together, D. 20 ¶ 19 (alleging that "Jane and John Does members of [FRPD] falsely charged [Pantoja] with assaulting and beating his [child] with a belt" in 2021); id. ¶ 21 (alleging that Pantoja was "falsely charged by Jane and John Does of [FRPD] with assaulting his [child] with a belt" in 2023); id. ¶ 35 (alleging under Count I that "[FRPD] denied Plaintiff his due process rights when they falsely charged Plaintiff with crime of assaulting and beating his son and fail[ed] to fully investigate"); id. ¶ 41 (alleging under Count II that "[FRPD] employees took actions detrimental to Plaintiff based on unreliable evidence and without proper basis or investigation"), Pantoja's allegations against FRPD raise claims of improper investigation and false arrest.

As to Pantoja's claim of improper investigation, the "alleged deficiencies in the defendants' investigation, without more, are not actionable" because "[t]he failure of police officers to conduct an adequate investigation is not [on its own] sufficient to state a civil rights claim under [§ ]1983." Williams v. City of Bos., 771 F. Supp. 2d 190, 200 (D. Mass. 2011) (determining that, "[t]o the extent petitioner believes police officers did not adequately investigate [his crime], petitioner fails to state a claim upon which relief can be granted because he has no constitutional right to a police investigation, adequate or otherwise" (alteration in original) (internal quotation marks omitted) (quoting Maness v. D.L. Runnels, No. 06-cv-0409-FCD-KJM-P, 2009 WL 1155670, at *4 (E.D. Cal. Apr. 29, 2009))).

As to Pantoja's claim of false arrest, the question is whether a "well-trained officer in [the defendants'] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." Wilmot, 938 F. Supp. 2d at 146 (alterations in original) (internal quotation marks omitted) (quoting Malley v. Briggs, 475 U.S. 335, 336 (1986)).

Immunity will not issue if "'no reasonably competent officer would have concluded'" that the action was lawful. Id. (quoting Lopera v. Town of Coventry, 640 F.3d 388, 396 (1st Cir. 2011)).

Here, "it is undeniable that the constitutional right to be free from arrest without probable cause was well established at the time of" Pantoja's two alleged arrests in 2021 and 2023. Id.; D. 20 ¶¶ 19, 21. Even as alleged by Pantoja, however, the allegations are sufficient to support an inference that FRPD had probable cause to support both arrests. Wilmot, 938 F. Supp. 2d at 146-47 (determining that police officer defendants were "entitled to qualified immunity" where "[t]he allegations of the Complaint, . . . establish[ed] that a reasonable officer could have concluded that there was probable cause for the arrest"). Between 2016 and 2021, Pantoja alleges that Kelly's parents reported to DCF that "Pantoja was abusing and neglecting [the child] during visits." D. 20 ¶¶ 12-13. Over this same period, DCF conducted "several 51A abuse investigations" into Pantoja, "approximately every month." Id. ¶ 14. As to the 2023 incident, the child had "sustained a small cut on his eye," and "allege[d] to school officials, the next day, that this injury was caused by [Pantoja] hitting him with a belt." Id. ¶ 21.

Even assuming *arguendo* that the reports made by Kelly's parents were false, see id. ¶¶ 12-13, that DCF acted maliciously or incompetently in investigating Pantoja, see id. ¶ 20, and that the child had been coerced into identifying Pantoja as an abuser to school officials in 2023, see id. ¶ 21, the facts as alleged by Pantoja demonstrate that a reasonable FRPD officer could have concluded that both the arrests were supported by probable cause, Wilmot, 938 F. Supp. 2d at 146, particularly because Pantoja does not allege that FRPD acted with knowledge of the motivations of either DCF or Kelly's parents, id. at 147 (explaining that "while the officers may have misinterpreted the information they had, they were not obligated to accept [the plaintiff's] denials"). "Since probable cause 'was at least arguable' at the time, the allegations of the

[c]omplaint establish that qualified immunity shields the officers from the false arrest claim" underlying Counts I and II. Id. (quoting Sheppard v. Aloisi, 384 F. Supp. 2d 478, 491 (D. Mass. 2005)).

In opposition, Pantoja alleges additional constitutional violations stemming from FRPD's investigations into and arrests of Pantoja, namely, "that his minor [child] was separated from him[,] violating numerous constitutional rights, without probable cause and/or a valid search warrant," D. 17 at 3, and that the "minor victim was interviewed outside [Pantoja's] presence," id. As to the first claim, the Court has already determined that probable cause was at least arguable at the time of both the 2021 and 2023 arrests. As to the second claim, FRPD's interview of the child away from Pantoja is not sufficient to strip the officers of qualified immunity. See Suboh v. Dist. Attorney's Off. of Suffolk Dist., 298 F.3d 81, 91 (1st Cir. 2002) (stating that "we have frequently upheld immunity for state actors who investigate child abuse allegations and take emergency action to protect a child").

Accordingly, Counts I and II are dismissed against Jane and John Does of FRPD in their individual capacities.[4]

---

[4] Pantoja's constitutional claims against FRPD Defendants in their official capacities under Counts I-II also fail because "[u]nder both Massachusetts and federal law, a suit against a municipal police department or its [officers] (in [their] official capacit[ies]) is deemed to be a suit against the municipality itself," Murphy v. Town of Natick, 516 F. Supp. 2d 153, 158 (D. Mass. 2007); see Wilson, 2019 WL 1757780, at *15 (providing that "a suit against a state official acting in his or her official capacity is the same as a suit against the entity of which the officer is an agent" (internal quotation marks omitted) (quoting Tyler v. Massachusetts, 981 F. Supp. 2d 92, 95 (D. Mass. 2013))), and, accordingly, such officers, acting in their official capacities, are "not 'persons' [within] the meaning of section 1983, and therefore are not subject to suit in the federal courts without a State's consent." Id. (alteration in original and internal citations omitted).

*2. MTCA Bars Liability as to Counts III and IV*

FRPD claims that Pantoja's intentional tort claims (Counts III-IV) are barred by Mass. Gen. L. c. 258, § 10(c). D. 15 at 2. Count III alleges intentional misrepresentation/deceit, D. 20 ¶¶ 42-45, and Count IV alleges intentional infliction of emotional distress, id. ¶¶ 46-50. As with Arsenault, neither Count can be brought against the FRPD officers in their official capacities under Mass. Gen. L. c. 258, § 10(c) (providing that liability "shall not apply to . . . any claim arising out of an intentional tort, including . . . intentional mental distress . . . misrepresentation, deceit"). D. 20 ¶¶ 42-50; D. 16 at 2; see Isijola v. Grasso, 768 F. Supp. 3d 166, 177 (D. Mass. 2025) (dismissing intentional tort claims against defendants, including state troopers, under Mass. Gen. L. c. 258, § 10(c)).

*3. Common Law Immunity Also Bars Intentional Tort Claims Against FRPD as to Counts III and IV*

FRPD asserts common law immunity as a defense against Pantoja's intentional tort claims (Counts III-IV), arguing that "no reasonable jury could infer that the Officers acted in bad faith, with malice, or corruptly towards" Pantoja. D. 16 at 11. In opposition, Pantoja argues that the FRPD officers were not acting in good faith, without malice or corruption, in arresting him, and further states that a jury could find that the officers knew that their actions in investigating and arresting Pantoja violated his constitutional rights. D. 17 at 5.

Common law immunity applies where a defendant is "'sued individually for an intentional tort.'" Wood v. City of Haverhill, No. 23-cv-12377-JEK, 2024 WL 4189932, at *5 (D. Mass. Sept. 13, 2024) (quoting S. Bos. Betterment Tr. Corp. v. Bos. Redevelopment Auth., 438 Mass. 57, 69 (2002)). "Common law immunity is distinct from qualified immunity under federal law," and shields "government employees acting within their discretion as public officials and in good faith," without malice or corruption, from liability. Nasir, 2020 WL 1027780, at *8.

"[O]vercoming Massachusetts' common law immunity requires more" than overcoming qualified immunity, as it makes "'every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare.' Allegations that demonstrate defendants acted with bad faith or malice may overcome defendants' claim to common law immunity." Id. at *9 (internal citations omitted) (quoting S. Bos. Betterment Trust Corp., 438 Mass. at 69). Showing that a defendant has acted in bad faith requires showing a breach of a known duty on account of some ill will or separate interest; showing that a defendant acted with malice requires showing that they intentionally acted wrongfully without just cause or excuse. Id.

FRPD's 2021 and 2023 investigations into and arrests of Pantoja form the factual basis of Pantoja's intentional tort claims (Counts III-IV). D. 20 ¶¶ 19, 21. At most, Pantoja alleges, in conclusory fashion, that he was "falsely charged" by FRPD, id. ¶¶ 19, 21, 35, and that FRPD failed to properly investigate the alleged incidents in either 2021 or 2023, id. ¶¶ 35, 41. He does not allege either corruption or improper motive on the part of FRPD. See Nasir, 2020 WL 1027780, at *9 (distinguishing cases involving corruption and improper motive). "[W]ith even the most liberal reading of the alleged facts, [the plaintiff's] generalized and conclusory allegations, without more, do not overcome the presumption that the Officers were acting in good faith in carrying out their official duties." Id.; see Najas Realty, LLC, 821 F.3d at 146 (dismissing state tort claims under common law immunity because "conclusory allegations" were not enough).

Accordingly, the Court ALLOWS the motion to dismiss as to the state law tort claims, Counts III and IV, against Jane and John Does of FRPD in their individual capacities. D. 16 at 12.

### D. Harassment (Count V)

As to Count V against all Defendants, Pantoja has also failed to plead a claim for harassment. D. 20 ¶ 52. Under Massachusetts law, "harassment is not a recognized tort." Landino v. Massachusetts Tchrs. Ass'n, No. 20-cv-11392-DJC, 2021 WL 2186815, at *5 (D. Mass. May 28, 2021) (internal quotation marks omitted) (quoting Bogan v. City of Boston, 489 F.3d 417, 422 n.3 (1st Cir. 2007)). Accordingly, Pantoja's "claim for harassment must fail." Id.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Arsenault's motion to dismiss, D. 27,[5] and FRPD's motion to dismiss, D. 15, as to all claims.

**So Ordered.**

/s/Denise J. Casper
Chief United States District Judge

[5] Although Pantoja has also named "Jane and John Doe" Defendants at DCF, D. 20 at 1-2, there are no specific, plausible allegations regarding their conduct and no basis to conclude that the generalized allegations against these unidentified individuals would not also be subject to dismissal for the same reasons as the claims against Arsenault. Accordingly, the Court also dismisses the claims against these Defendants. See, e.g., Velazquez-Martinez v. Colon, 961 F. Supp. 362, 366 (D.P.R. 1997) (noting that "[a]lthough the fictitious defendants cannot move for dismissal, the court has the power to dismiss *sua sponte*").